Charles EVANS, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 17224, 17225.

United States Court of Appeals
Eighth Circuit.

Dec. 23, 1963.

---

5. Keller v. Linsenmyer, 1927, 101 N.J.Eq. 664, 676, 139 A. 33, 39.

Robert H. Berkshire, Omaha, Neb., for appellant.

Theodore L. Richling, U. S. Atty., Omaha, Neb., for appellee.

Before VOGEL, MATTHES and MEHAFFY, Circuit Judges.

VOGEL, Circuit Judge.

Charles Evans, the appellant herein, was charged in two indictments returned in the United States District Court for the District of Nebraska. Indictment No. 0744 contained three counts alleging violations of 18 U.S.C.A. §§ 2113(a), (b) and (c) in that the appellant individually and in concert with Richard Lee Davis and Charles Edward William Saxton did commit the crimes of bank robbery as defined in the foregoing sections. In indictment No. 0802 appellant was accused of transporting in interstate commerce stolen money of a value exceeding $5,000 in violation of 18 U.S. C.A. § 2314. Davis pleaded guilty as to the charges against him. Saxton, who was alleged to have been the driver of the car used by Davis and Evans in getting away after the robbery, was tried and acquitted. The two indictments against appellant Evans were consolidated for trial.[1] Tried before a jury on November 13, 14 and 15, 1962, appellant was found guilty on all three counts of indictment No. 0744 and on one count of indictment No. 0802. Appellant was sentenced on indictment No. 0744 to prison confinement for a term of 20 years on each of Counts I and III, such sentences to be served concurrently and not consecutively. No sentence was imposed on Count II. On indictment No. 0802 the appellant was sentenced to prison confinement for a term of five years, such sentence to be served consecutively to the prior sentence. In other words, appellant was sentenced to serve a total of 25 years.

In this appeal, wherein the appellant is represented by counsel appointed by the court, three issues are raised:

1. That the United States illegally transported the defendant from the district of arrest to the district where the warrant was issued in violation of the provisions of Rule 40 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., and that accordingly the District Court did not have jurisdiction over the defendant-appellant and that all proceedings subsequent to his arrest were a nullity;

2. That evidence of admissions, confessions and actions of the appellant after arrest for a period of twelve hours before he was arraigned by a United States Commis-

---

1. This accounts for the fact that there were two notices of appeal and separate numbers assigned to each appeal. They are here, however, as in the trial court, considered together.

sioner were inadmissible and the District Court committed error therein;

3. That it was error on the part of the trial court to fail to instruct the jury that it must find beyond a reasonable doubt that the confession was freely and voluntarily given and that unless they so find they should not give any consideration to the confession in weighing the guilt or innocence of the defendant.

In addition to the foregoing, the appellant filed supplemental briefs *pro se* supportive of those filed by his attorney but also charging additional errors in that he was arrested without a warrant; that upon being handcuffed various items were forcibly taken from him, such as his wallet containing $385, his Social Security card, his savings account book, his sport coat, and a pair of shoes. Appellant sought recovery of these items; his requests were denied, and thereupon error is predicated. Additionally, he claims that there was error in failure to provide him with a preliminary hearing; that there was error in the indictment (not pointed out); that he had been held incommunicado in McCook, Nebraska, and in Lincoln, Nebraska, and that he was forced to take part in a line-up contrary to the provisions of the Sixth Amendment to the Constitution of the United States.

At the jury trial of the appellant the evidence indicated the following: On April 14, 1962, the First State Bank of Enders, Nebraska, whose deposits were insured by the Federal Deposit Insurance Corporation, was robbed at gunpoint by two men. Money obtained by the robbers totalled $21,170. On the same day of the robbery at approximately 2:30 p. m. Richard Lee Davis was apprehended while walking down a highway away from an abandoned car which answered the description of the car used in the get-away after the robbery. On his person and stuffed into various pockets was a total of $9,144.85, admitted by him to be part of the money taken in the robbery. Saxton was apprehended at approximately 9:30 p. m. on the day of the robbery. Both Davis and Saxton were taken by the local sheriff into Wray, Colorado, before they were turned over to federal authorities. On the following day, April 15, 1962, a complaint for violation of 18 U.S.C.A. § 2113 was filed and a warrant for the arrest of the appellant was issued, probably at McCook, Nebraska, by United States Commissioner Eva L. Spencer of Indianola, Nebraska.

Appellant Evans was arrested by Sheriff Ernest Price of Yuma County, Colorado, about sixteen miles northwest of Wray, Colorado, shortly after 10:30 a. m. on April 18, 1962. Sheriff Price's arrest followed information he received from the FBI to the effect that a warrant was outstanding for the arrest of appellant as one of the bank robbers. Upon being searched, appellant was found to have $365.62 in his possession. At the time of arrest, the sheriff advised the appellant that he was entitled to be represented by counsel and that any statement he might make might be used against him but that he did not have to make any until he had seen counsel. According to the sheriff:

"* * * he told me that he and Saxton was driving the car; that Davis and he robbed the bank but he thought it was a co-op concern when they went in, but after they went in they went ahead and robbed it, and took the money in sacks and left and proceeded on, and Saxton was doing the driving.

"We went over to where he said he had got out of the car, and he showed us a draw there, which is about 50 yards from the highway, and he said this airplane was above him and he laid down on his left side and dug a hole and buried this money.

"He said after the airplane left, he saw this stack and crawled in the stack, and we had—there were four of us there—three of us first, and

then in a little bit there was a farmer stopped there."

In response to the sheriff's suggestion that he "might just as well tell us where the money is", the appellant said, "I will tell you that much. It is not here. I will take you where the money is at." He directed the sheriff and other law officers to the area where the abandoned car had been found and where he said the money was buried and where an unsuccessful search for it was conducted.

At approximately 1:00 p. m. the appellant was taken into Wray, Colorado, where he was allowed to shave, bathe and given clean clothing. Appellant told the sheriff that he had had breakfast Saturday morning, the day of the robbery, but had had no food thereafter. Upon the advice of a dietitian, he was fed a light meal consisting of a malted milk and a raw egg.

At 1:29 p. m. the appellant was interviewed at Wray by FBI Special Agent Donald J. Sebesta. Prior thereto appellant had been in the custody of state law enforcement officers only. Sebesta advised the appellant who he was, showed him his credentials, told him he did not have to talk to him if he did not desire to do so and that anything he might say could be used in a court of law against him, and that he had the right to have an attorney. Appellant admitted his identity, that he was Charles William Evans, and admitted that he, in company with Davis and Saxton, had robbed the First State Bank at Enders, Nebraska, on April 14th; that he thought it was a co-op and not a bank.

At the trial, the appellant was identified by the cashier of the bank and by his wife, who was also a bank employee, as being one of the men who participated in the robbery. Richard Lee Davis, who admitted participation in the robbery and who pleaded guilty, testified that he and the appellant robbed the bank together. The admissions of the appellant were made verbally to Sheriff Price at the place of arrest. These were admitted, over objection, during the government's case in chief. Similar admissions made to FBI Agent Sebesta were not offered by the government until rebuttal, and after the appellant had taken the stand and testified in his own behalf, had admitted that he told Sheriff Price that he "robbed something over there," but nevertheless denied the bank robbery.

The appellant was the only witness in his behalf. He admitted to having been convicted of felonies by his pleas of guilty on three separate occasions. He claimed that in this instance he pleaded not guilty because that was the truth. He denied the robbery and denied transporting stolen money across state lines. We relate appellant's story of the evening prior to and the day of the robbery indicating his version as to how he became involved. He testified that he, Davis and Saxton and a man by the name of Joe Hunt were in a booth in a bar in Denver, Colorado, drinking on the evening before the robbery; that while there one Don Priest told them of a bank in Enders, Nebraska, which was some sort of farmers co-op; that it handled crop money and that the farmers in that area deposited their money there, and that there would be around $60,000 to $70,000 in the bank. Appellant claimed that he told Priest that he did not want to become involved in any way, that he was on parole at the time. Priest tried to get him to rent a car, obviously for use in the intended robbery, and attempted to give him five $20 bills. The appellant claimed that he could not rent a car because his license had expired and couldn't be renewed until he had terminated his parole. Hunt offered to "get you gentlemen a car without any cost". Later Hunt and Saxton returned and advised that they had a car and there was conversation about needing a screwdriver to exchange the plates. Appellant offered to get a screwdriver at his apartment and he, Davis and Saxton went there for that purpose. While they were there, Hunt appeared with a set of license plates. Saxton offered to change the plates, left and when he

came back said, "Let's go." During arguments among the men present, Priest called the appellant to one side and said, "Look, Evans, I planned this too long to have anything to go wrong." Appellant attempted to argue with Priest, telling him that he was on his way to Tulsa, Oklahoma, and didn't want anything to do with this. Priest told him, "Keep an eye on Davis until he sobers up a little bit." Upon appellant's insistence that he was going to Oklahoma, Priest told him, "Well, at least you can go as far as St. Francis, Kansas, with them. They can drop you off there, and by then Mr. Davis may be sober enough." Appellant agreed to ride as far as St. Francis, Kansas, with Saxton and Davis and decided that he could then either talk them into taking him on to Salina or he could take a bus to Tulsa. Appellant claims to have been "pretty well drunk" at the time. They continued drinking and driving. The appellant does not remember the entire trip and doesn't know "what happened to St. Francis." He slept on and off. When he awakened, they were parked beside a lake at the outskirts of Enders, Nebraska. The time was approximately five-thirty or a quarter to six a. m. They went to Imperial, Nebraska, for breakfast. Davis made some purchases, coming back with packages and saying to Saxton, "I have the articles here we talked about." Appellant claimed that he then told Davis and Saxton, "I don't know whether you fellows are going to go through with this or not, but if you are, I want clear out of it. I told you before I am on parole and on my way to Tulsa, Oklahoma, to see my family, and I want completely out of it."

They got into the car, with Saxton driving, Davis arguing with the appellant that he, the appellant, had appeared ready and willing to "go through with it" the night before. They arrived in Enders, going by a building when Davis said, "There is the place on the corner." They drove through Enders. Davis and the appellant continued to argue; finally the appellant insisted that

Saxton stop the car and let him out. Saxton told him, "I do not believe that Mr. Davis or anybody will go through with this." "Stay on the road and I will pick you up on the way back." After hitchhiking a ride and also avoiding persons for fear of being picked up on suspicion, the appellant claims to have gotten lost. He hid in cornfields and hay stacks for a couple of days and finally ended up in an abandoned tenant house, where he was ultimately discovered and arrested.

Subsequent to the arrest, appellant testified that being "four days and four nights without any food and water, I am on parole, out of the state without permission, they are not going to believe me anyway, so I told Mr. Price in this way: * * * 'We robbed it' * * 'Yes, that is right; that is right; we robbed something.'" Appellant was then taken back on the road and assisted in directing a search for the buried money.

Appellant's first and primary point concerns the District Court's jurisdiction over him and his claim that all proceedings subsequent to his arrest became a nullity. He insists that there was a violation of the provisions of Rule 40 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., pointing out that he was arrested as the result of a warrant that had been issued in Indianola, Nebraska; that his arrest took place about sixteen miles north and west of Wray, Colorado, at about 10:30 a. m. on April 18, 1962; that after his arrest he was taken to Wray, Colorado, where admittedly he was given some food, a bath, a change of clothing and shaved; that he was then returned to the vicinity of his arrest for a second unsuccessful hunt for the buried money and kept there until about 5:30 p. m. of that day; that thereafter he was transported to Indianola, Nebraska, and he was then for the first time taken before a United States Commissioner at either Indianola or McCook, Nebraska. He insists that the place of arrest was more than a hundred miles from where the warrant au-

thoriżing his arrest was issued. The latter point is much in dispute, the government contending that the point of arrest is within one hundred miles of McCook where it claims the warrant was issued. Appellant insists that the warrant was issued at Indianola and that the place of arrest was more than a hundred miles therefrom. Methods of measuring distance could support either contention, depending upon which measurement one used for the determination. In view of subsequent events, we think the point immaterial and need not be further explored. It might be said in passing, however, that the original arrest was made by Sheriff Price of Yuma County, who took the appellant into Wray, Colorado, Price having received information that a warrant for the appellant was outstanding. Very apparently federal officials did not see, obtain access to or assume jurisdiction over the appellant until they found him in Wray in custody of Sheriff Price. Wray is less than one hundred miles by what appears to be the best highway from McCook and probably slightly over a hundred miles from Indianola.

On April 27, 1962, a grand jury returned indictment No. 0744. A warrant was issued on that indictment on April 30, 1962, and served on the appellant on May 1, 1962. The record also indicates that on May 1, 1962, Davis, Saxton and the appellant Evans were brought before the Honorable Richard E. Robinson, Chief Judge. None of the defendants was represented. Their right to counsel was carefully explained to them. In answer to the question of whether or not they desired counsel to represent all three of them or separate counsel, Davis stated that it made no difference but Saxton and Evans, the appellant herein, each requested separate counsel. They were told that they would have an opportunity to employ counsel of their own choosing. Nevertheless, the record shows that on the same date, May 1, 1962, "upon the request of the defendant", an order was entered appointing Joseph P. Inserra to represent Evans in all matters pertaining to the action. On June 8, 1962, the appellant signed a receipt for a copy of indictment No. 0744. The receipt is also signed by Joseph P. Inserra as "counsel for defendant". On July 6, 1962, the appellant Evans appeared in court before Chief Judge Robinson, together with his prior-thereto court-appointed counsel, Joseph P. Inserra. It had been indicated to the court that the appellant was dissatisfied with the appointment of Mr. Inserra and that he had been negotiating for an attorney of his own choice but had not yet completed negotiations. Mr. Inserra stated that with the court's permission he would like to withdraw as attorney for the appellant. Appellant stated that he had had some difficulty in connection with obtaining an attorney of his own choice. The matter was continued with the understanding that the appellant would still attempt to obtain counsel of his own choosing.

On July 9, 1962, appellant was again brought before Judge Robinson, who inquired as to whether arrangements for counsel had been made. Appellant replied, "No, sir. It was still tentative. We have been working on that, and there is no definite solution to that problem right at the present time." Again the matter was continued and arrangements made so the appellant could confer with other persons in his efforts to obtain counsel. On July 16, 1962, a hearing was held before Chief Judge Robinson on the appellant's request for a reduction in bail. The request was denied. At that time the court stated that it would give the appellant another week to obtain counsel of his own choice and that if he was unable to do so, the court intended to appoint counsel for him, " * * * because I think you should have counsel, and preferably counsel of your own choice, but if not, the court will appoint counsel for you." Ultimately on October 4, 1962, the court appointed Mr. John Miller of Omaha, Nebraska, as counsel for the appellant.

On September 27, 1962, the grand jury had returned an indictment

in criminal case No. 0802. The indictment was in two counts, the first charging a violation of 18 U.S.C.A. § 2314 and the second a violation of 18 U.S.C.A. § 2312. Subsequently the government moved to dismiss the second count, which motion was granted. On November 9, 1962, appellant was arraigned on both indictments and with his counsel present, entered pleas of not guilty as to all charges. After numerous preliminary motions made in appellant's behalf by his counsel, the case went to trial before a jury, resulting in his conviction as noted supra. At no time during or prior to trial was there any question raised as to the District Court's jurisdiction over the appellant's person. Even if there had been, we think the court would have been justified in denying the attack. Nevertheless, assuming *arguendo* that appellant might have successfully raised some objection, we believe that by his failure so to do and by his entering pleas of not guilty he waived any objections thereto. This court in Bistram v. United States, 8 Cir., 1958, 253 F.2d 610, had similar questions raised. Therein Judge Matthes, speaking for the court, said at page 612:

> "For an equally cogent reason, appellant's contention must be disallowed. It has long been a firmly entrenched principle of federal jurisprudence that if the accused is personally before a court having jurisdiction of the subject matter, that court has jurisdiction over the accused regardless of how he was brought into the presence of the Court. Strand v. Schmittroth, 9 Cir., 233 F.2d 598, appeal dismissed, 355 U.S. 886, 78 S.Ct. 258, 2 L.Ed. [2d] 186, and cases cited in footnote 11, at page 604 of 233 F.2d; Robinson v. United States, 6 Cir., 144 F.2d 392, loc. cit. 396, affirmed, 324 U.S. 282, 65 S.Ct. 666, 89 L.Ed. 944; Chandler v. United States, 1 Cir., 171 F.2d 921, certiorari denied, 336 U.S. 918, 69 S.Ct. 640, 93 L.Ed. 1081; Hardy v. United States, 8 Cir., 250 F.2d 580. In Frisbie v.

Collins, 1952, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541, the Supreme Court considered the claim of respondent Shirley Collins that while he was living in Chicago, Michigan officers 'forcibly seized, handcuffed, blackjacked and took him to Michigan.' The contention was that the trial and conviction under such circumstances was in violation of the Due Process Clause of the Fourteenth Amendment and the Federal Kidnapping Act. In ruling the point, the Court stated, 342 U.S. at page 522, 72 S.Ct. at page 511:

> " 'This Court has never departed from the rule announced in Ker v. Illinois, 119 U.S. 436, 444, 7 S.Ct. 225, 229, 30 L.Ed. 421, that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.'
>
> "To like effect are United States v. Rosenberg, 2 Cir., 195 F.2d 583, certiorari denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687, and United States ex rel. Master v. Baldi, 3 Cir., 198 F.2d 113, certiorari denied, Pennsylvania ex rel. Master v. Baldi, 340 U.S. 866, 71 S.Ct. 88, 95 L.Ed. 632."

Here, too, appellant confuses jurisdiction over person with that over the subject matter. Jurisdiction over the subject matter may be questioned at any

603

time and any place. It cannot be waived, nor can it be provided by stipulation. Note Pon v. United States, 1 Cir., 1948, 168 F.2d 373, together with the additional citations given in Judge Matthes' opinion, supra, at page 612 of 253 F.2d. We think Bistram and the cases therein cited fully answer appellant's first contention and accordingly find it without merit.

■ Appellant's second point is that evidence as to his admissions, confessions and actions after his arrest and for a period of some twelve hours prior to the time he was taken before a United States Commissioner should have been held inadmissible. His contentions go to:

1. Admissions made by him to Sheriff Price at the time and place of his arrest.

2. Testimony of Sheriff Price as to the search for the hidden money in which appellant participated and which occurred immediately after his arrest and before he was taken to Wray, Colorado.

3. Appellant's admissions to FBI Special Agent Sebesta, given to Sebesta at Wray, Colorado. Testimony as to such admissions was given in rebuttal only and after appellant had testified in his own behalf, had admitted telling Sheriff Price that he had been involved in the robbery, but nevertheless denied taking part therein.

At the time of trial appellant's counsel made a motion to suppress the foregoing oral admissions and the testimony of Sheriff Price. It appeared that at the time Sheriff Price talked with the appellant immediately following his arrest, no federal officer was present nor had the appellant been arrested by any federal representative. The court made meticulous inquiry as to whether or not appellant was advised of his rights prior to allowing the sheriff to testify as to the admissions and upon being satisfied that he had been, overruled the motion. Special Agent Sebesta arrived in Wray approximately 1:30 that afternoon. The appellant had been fed, bathed, clothed and shaved. The nearest commissioner resided at McCook, Nebraska, or Indianola, Nebraska, about a 2½-hour drive from Wray. Some $10,000 or $12,-000 of the money taken from the First State Bank of Enders had not been recovered and appellant claimed that he knew where it had been hidden. We think it not unreasonable that there was a delay to make a search of the premises near the place of arrest. See Holt v. United States, 8 Cir., 1960, 280 F.2d 273. The delay here in no way affected the credibility of the witness Sheriff Price or the rebuttal testimony given by FBI Special Agent Sebesta. The statement of the Supreme Court in Mallory v. United States, 1957, 354 U.S. 449, 455, 77 S.Ct. 1356, 1359-1360, 1 L.Ed.2d 1479, very adequately explains the situation:

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' [Rule 5(a) F.R.C. P., 18 U.S.C.A.] indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession."

There was no opportunity given or made here for the forcible extraction of a confession. Sheriff Price's conversation with the appellant immediately following his arrest was preceded by a full explanation of the appellant's rights and we believe the trial judge properly overruled the motion to suppress such testimony. When the FBI took over with the appearance of Special Agent Sebesta at approximately 1:30 p. m. that same day at Wray, the appellant had been bathed, shaved, given a change of clothing, a dietitian had been interrogated as to what he should be fed, and he was given a malted milk with a raw egg. Agent Sebesta exhibited his credentials, told the appellant he did not have to talk if he did not desire to do so, that anything

**604**

he might say could be used in a court of law against him, and that he had the right to have an attorney. The appellant admitted his identity and admitted verbally that he and Davis and Saxton had robbed the First State Bank at Enders but explained that they thought it was a co-op and not a bank. Sebesta informed the appellant that he had the right to telephone a lawyer. Thereafter the appellant participated in the second unsuccessful search for the hidden money. Subsequently he was taken before a United States Commissioner for arraignment. Sebesta's testimony appeared as rebuttal and solely for the purpose of impeaching the appellant's own statement when he testified in his own behalf. We hold evidence as to the admissions and the actions of appellant immediately following his arrest was properly admissible.

■ Appellant's third contention is that the court committed reversible error by failing to instruct on the voluntariness of the appellant's admissions. The trial court gave each one of the appellant's requested instructions. No request was made to instruct on the question of the voluntariness of the appellant's admissions. Additionally, appellant did not except to the court's charge, although the court was again meticulous in providing opportunity therefor. Exception to the charge was taken by the government. Nevertheless, the appellant urges this court to find plain error under Rule 52(b), Federal Rules of Criminal Procedure, 18 U.S.C.A., which provides:

> "(b) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Judge Van Oosterhout, in speaking for this court with reference to the applicability of Rule 52(b), said in Gendron v. United States, 8 Cir., 1961, 295 F.2d 897, 902:

> "The application of Rule 52(b) rests within the sound judicial discretion of the appellate court. The

normal rule is that an appellate court should not consider questions which have not been properly raised in the trial court and upon which the trial court has had no opportunity to pass. The plain error rule should be applied with caution and should be invoked only to avoid a clear miscarriage of justice. To exercise the right freely would undermine and impair the administration of justice and detract from the advantages derived from orderly rules of procedure. See Johnson v. United States, supra [8 Cir., 291 F.2d 150, 156]; Billeci v. United States, supra [9 Cir., 290 F.2d 628, 629]; Page v. United States, supra [8 Cir., 282 F.2d 807, 809]."

We have read the entire transcript of this trial and have carefully considered the complete record, including the court's charge. The evidence of the appellant's guilt was overwhelming. The care with which the trial judge inquired before ruling on the admissibility of the appellant's oral statements to ascertain whether they were made voluntarily and after apprisement of his rights was as it should be. True it is that had a request for a charge on the question of the voluntariness of appellant's oral admissions been requested, it could and undoubtedly would have been given. Nevertheless, we are satisfied, from a consideration of the court's entire charge, that the jurors could not possibly have been confused, led astray, or have misunderstood. Accordingly, we do not find this a case for the application of the "plain error" rule. Appellant's contentions therein will not be sustained.

■ Claims of error raised by the appellant in his briefs *pro se* have also been given attention. Many of them are repetitious of those raised by his attorney which we have already considered and disposed of. Others, such as failure to return personal property taken from him at the time of his arrest by Sheriff Price and his deputies, are without merit. Even if the property had been un-

lawfully taken from him and unlawfully withheld from him, it could here make no difference as the record indicates such items were not offered as exhibits or used during the trial. Other claimed errors, if any there were, have been waived by failure to take advantage thereof before trial. Rule 12 (b) (2), Federal Rules of Criminal Procedure, 18 U.S.C.A. We have nevertheless considered all of appellant's contentions and find them to be without merit.

Mr. Robert H. Berkshire, of Omaha, Nebraska, was appointed by this court to represent the appellant. His substantial brief and reply brief and his oral argument before this court indicate careful and thoughtful attention to the rights of the appellant. This court expresses its appreciation to Mr. Berkshire.

Affirmed.